UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

JOHN THOMAS, M.D.,

      Plaintiff,

v.

ST. JOSEPH HEALTH SYSTEM, et al.,

      Defendants.

No. 5:20-CV-028-H

**ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION AND
GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

      Dr. Thomas brought his RICO claim against Covenant Medical Center (CMC).  He meant to sue the Covenant Medical Center hospital where he worked previously; in reality, he sued the Covenant Medical Center corporation that acquired the hospital in January of 2019—nearly two years after the alleged RICO violation.  Well after the deadline to amend pleadings had passed, CMC produced the merger agreement detailing this acquisition and the resulting liabilities of CMC and Covenant Health System (CHS), who owned the hospital before the merger.  In light of this recent discovery, Dr. Thomas asks the Court to either (1) reconsider its order dismissing CHS from this suit, or (2) grant him leave to amend his complaint to add CHS as a defendant to his RICO claim.  Dkt. No. 86.  Reconsideration is denied because it is not the proper vehicle for introducing a new defendant to an existing claim against another defendant.  But, finding good cause for an amendment, that it would serve the interests of justice, and that it relates back to the original pleadings, the Court grants Dr. Thomas leave to amend his complaint.  CHS may be added as a defendant to Dr. Thomas's RICO claim.

1.     **Factual Background**

Dr. John Thomas is a Lubbock-based physician with years of experience in laparoscopic and minimally invasive gastroenterology surgery.  Dkt. No. 40 ¶¶ 1, 8.  From 2002 until 2014, Dr. Thomas claims he held privileges at CMC, whom he identifies as "CHS's flagship hospital" in his amended complaint.  *Id*. ¶¶ 4, 9.  CMC is wholly owned by CHS, which is wholly owned by St. Joseph Health System.  *Id.* ¶ 4.

A.     **Patient's Death in February 2014**

On February 10, 2014, Dr. Thomas performed a diagnostic laparoscopy with lysis of adhesions[1] and a laparoscopic cholecystectomy[2] on a patient at a Covenant Medical Center hospital.  *Id*. ¶ 11.  Before the surgery, the patient had seen Dr. Donald Quick, a specialist in hematology and oncology.  *Id*. ¶ 12.  Dr. Thomas claims to have completed the operation without complications.  *Id*. ¶ 10.  The patient received post-operative care from Dr. Quick, who prescribed a blood thinner called Lovenox to prevent blood clots.  *Id*. ¶ 12.

A few days later, the patient showed signs of gastrointestinal bleeding, and Dr. Quick issued an order to stop the Lovenox injections through the hospital's Meditech software.  *Id.* ¶ 13.  Dr. Thomas claims that the injections were stopped for three hours, but, despite Dr. Quick's order, they were resumed and continued until February 17, 2014—the day the patient died.  *Id.*

---

[1] This procedure removes scar tissue.

[2] This is a minimally invasive procedure to remove the gallbladder.  Instead of making a large cut to remove the gallbladder, the surgeon makes several small incisions.  The abdomen is filled with gas to create space for the operation, and a small camera is inserted through an opening near the belly button so the surgeon can see the surgery.  Once the surgeon can see the gallbladder, it is disconnected and removed through one of the incisions.

### B.   Termination of Dr. Thomas's Hospital Privileges

Following the patient's death, an ad hoc committee reviewed Dr. Thomas's performance.  *Id.* ¶ 14.  According to his amended complaint, the peer review "blatantly and purposefully covered up the critical factor of the improper continuation of Lovenox after it had been ordered to be discontinued."  *Id.* ¶ 18.  The review concluded that Dr. Thomas did not provide an adequate standard of care, so Dr. Thomas lost his privileges at the hospital.  *Id.* ¶¶ 14–15.  According to Dr. Thomas, Dr. Quick was not held responsible for his role in the patient's death, and the Meditech software system never received the proper level of scrutiny that it deserved.  *Id.* ¶¶ 18, 20.

### C.   Reports to Professional Associations

In addition to terminating Dr. Thomas's hospital privileges, Dr. Thomas alleges that CMC informed multiple medical groups, including the Texas Medical Board (TMB) and the American College of Surgeons (ACS), about his treatment of the patient.  *Id.* ¶¶ 22, 25.  He claims that in 2015, CMC reported to the TMB that he was responsible for the death of the patient and that his hospital privileges had been revoked for substandard care.  *Id.* ¶ 22.  And based on CMC's report, the TMB took disciplinary action against Dr. Thomas that eventually resulted in Dr. Thomas entering into an agreed order where he admitted to providing the patient with substandard care, resulting in the patient's death.  *Id.* ¶ 24.

In December 2017, the ACS notified Dr. Thomas that it knew about the agreed order.  *Id.* ¶ 25.  According to Dr. Thomas, CMC alerted the ACS to the agreed order and made the same alleged misrepresentations that it had made to the TMB.  *Id.*  The ACS then disciplined Dr. Thomas for providing substandard care.  *Id.*  And in June 2018, the ACS reported Dr. Thomas's discipline to the National Practitioner Data Bank.  *Id.* ¶ 26.

2.     **Procedural History**

In his original complaint, Dr. Thomas brought four claims against three defendants—CMC, CHS, and St. Joseph.  Dkt. No. 1 ¶¶ 29–46.  He alleged promissory estoppel and a civil RICO violation against CMC (*id.* ¶¶ 34–41), as well as intentional interference with prospective business relations and conspiracy to violate RICO against all defendants (*id.* ¶¶ 29–33, 42–46).[3]  Dr. Thomas requested that the Court enjoin the defendants from denying him medical privileges based on the deceased-patient's treatment and from disclosing any details regarding the deceased-patient's treatment to various professional associations.  *Id.* ¶¶ 47–49.  He also requested public retractation of all statements made to physician reporting agencies.  *Id.*

Upon the defendants' motion, the Court dismissed his promissory estoppel claim sua sponte for lack of subject matter jurisdiction.  Dkt. No. 38 at 5–6.  It also dismissed his RICO-conspiracy and intentional-interference claims without prejudice for failure to state a claim.  *Id.* at 18–21.  It reasoned that Dr. Thomas had not alleged facts showing either (1) an agreement amongst the defendants sufficient for a RICO-conspiracy action, or (2) a reasonable probability of entering a business relationship sufficient for an intentional-interference action.  *Id.* at 18–20.  The Court did, however, find that Dr. Thomas had stated a facially plausible RICO claim as it related to the 2017 report to the ACS.  *Id.* at 8–14.

Dr. Thomas amended his complaint within the prescribed period and realleged his RICO-conspiracy and intentional-interference claims against the defendants.  Dkt. No. 40 ¶¶ 37–41, 47–51.  He also maintained his RICO claim against CMC.  *Id.* ¶¶ 42–46.  The

---

[3] Dr. Thomas asserted his RICO claim and RICO-conspiracy claim as separate causes of action in his amended complaint.  Dkt. No. 40 ¶¶ 42–51.  He alleged the predicate RICO violation against just CMC, while he alleged *conspiracy* to commit a RICO violation against all three defendants.  *Id.*

Court again dismissed his RICO-conspiracy and intentional-interference claims because he failed to allege new facts to cure the deficiencies in his original complaint. Dkt. No. 66 at 7–10.  Finding no viable claims against CHS or St. Joseph, the Court dismissed both from this suit.  *Id.* at 13.  Thus, only Thomas's RICO claim against CMC has survived.  *See* Dkt. No. 38 at 11–14.

After the Court's dismissal of CHS and St. Joseph, CMC requested that the Court stay or limit discovery because it intended to seek summary judgment. Dkt. No. 68 at 5–6. Dr. Thomas moved to compel responses to his discovery requests, alleging that CMC had produced nothing.  Dkt. No. 73 at 2–3, 9.  CMC then moved for summary judgment.  Dkt. No. 74.  CMC claims that it could not have committed the RICO violation alleged in Dr. Thomas's complaint because it did not operate the Covenant Medical Center hospital at the time of the alleged conduct.  *Id.* at 1–2.  According to CMC, it did not conduct material business operations until it acquired the hospital in 2019.  *Id.* at 3.  Because Dr. Thomas's RICO claim surrounds a report to the ACS in 2017, CMC asserts "[t]here is no question of material fact" as to whether it engaged in the alleged conduct.  *Id.* at 7.

The Court granted CMC's motion for a protective order in part.  Dkt. No. 78 at 1.  It limited discovery to only that "necessary to address the issues presented in [CMC's] Motion for Summary Judgment," specifically "whether [CMC] engaged in the alleged conduct and whether it may be held liable for it in this context."  *Id.* at 1, 4.  But the Court stayed briefing related to summary judgment pending resolution of Dr. Thomas's motion to compel.  Dkt. No. 79 at 1–2.  And the Court resolved that motion in October 2021, permitting discovery to the extent it would aid Dr. Thomas in responding to CMC's motion for summary judgment.  Dkt. No. 85 at 1–3.  The Court then lifted the stay on summary judgment

briefing and ordered Dr. Thomas to respond to CMC's motion by no later than November 24, 2021.  *Id.* at 3.

On November 18, 2021, Dr. Thomas moved for reconsideration.  Dkt. No. 86.  He asks the Court to reconsider its dismissal of CHS and bring back CHS as a defendant to this lawsuit.  *Id.* at 1.  In the alternative, he asks the Court to grant leave so that he may amend his complaint to add CHS as a defendant to his RICO claim.  *Id.* at 9–10.  Dr. Thomas argues that, taking as true CMC's allegation that it did not assume the liabilities of the Covenant Medical Center hospital upon acquiring it from CHS, "CHS is a necessary party." *Id.* at 2.  But he claims that CMC failed to provide any evidence regarding either CMC's or CHS's liability until July 19, 2021, when it produced the merger agreement.  *Id.* at 5.

CMC and CHS argue in response that a footnote in their original motion to dismiss put Dr. Thomas on notice in March of 2020 of their corporate structure and respective liabilities.  Dkt. No. 92 at 5.  That footnote reads, in part:

> Prior to January 1, 2019, the hospital was directly owned by CHS and operated by it under the facility name "Covenant Medical Center." Effective January 1, 2019, the new CMC nonprofit corporation acquired the hospital from CHS. Defendant CMC did not assume any potential liabilities or obligations of CHS relating to any matter involving Dr. Thomas. Defendant CMC did not conduct any material business operations prior to January 1, 2019.

*Id.*  CMC and CHS thus ask the Court to deny Thomas's motion to reconsider as, according to them, the relevant facts have not changed.  *Id.* at 6–7.

In reply, Dr. Thomas contends that he had no obligation to "rel[y] on CMC's unsupported assertions contained in a footnote . . . without having seen the acquisition agreement [] to verify [CMC's] claims."  Dkt. No. 96 at 2.  He reasserts his request that the

Court reconsider its order dismissing CHS from this suit or, alternatively, grant him leave to amend his complaint to add CHS as a party. *Id.* at 2–3.

This Court denied CMC's motion for summary judgment without prejudice to refiling its motion—verbatim if necessary—after the Court resolves Dr. Thomas's motion for reconsideration. Dkt. No. 97 at 1. As the motion for reconsideration has been fully briefed by the parties, it is ripe for review.

### 3.    Legal Standards

#### A.    Motion for Reconsideration

Before entry of a final judgment that ends a lawsuit, a court may generally reconsider any order that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties." Fed. R. Civ. P. 54(b). The Federal Rules of Civil Procedure do not prescribe a standard for weighing a Rule 54(b) motion for reconsideration, but a court retains "broad discretion" in these situations. *Est. of Henson v. Wichita Cnty.*, 988 F. Supp. 2d 726, 729 (N.D. Tex. 2013) (citing *Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1414 (5th Cir. 1993)). It may grant such a motion "for any reason it deems sufficient." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)). In other words, unlike the stringent standards for reviewing final judgments under Rules 59 and 60, a court may reconsider interlocutory orders "as justice requires." *Id.* at 336–37.

Despite this broad discretion, courts have maintained that motions for reconsideration under Rule 54(b) "should [not] automatically be granted." *Highland Cap. Mgmt., L.P. v. Highland Cap. Mgmt. Servs., Inc.*, No. 3:21-CV-1378-N, 2021 WL 7540296, at *1 (N.D. Tex. Dec. 7, 2021). They have opted to exercise their discretion sparingly "to

forestall the perpetual reexamination of orders and the resulting burdens and delays." *Id.* In practice, this means reconsidering only those decisions rising to the level of "clear error" or a "manifest injustice." *See Daniels v. Bowles*, No. CIV.A. 3:03-CV-1555, 2004 WL 1810658, at *2 (N.D. Tex. Aug. 9, 2004). The apparent "evolution of [the] litigation," including new evidence or changes to the law, might signal such an error. *Highland Cap. Mgmt., L.P.*, 2021 WL 7540296, at *2; *see, e.g.*, *Neaville v. Wells Fargo Bank, N.A.*, No. 3:11-CV-97-P, 2013 WL 12124590, at *2 (N.D. Tex. June 4, 2013) (denying a motion for reconsideration that "d[id] not bring forth any new evidence" or "correct a manifest error of law or fact"); *Daniels*, 2004 WL 1810658, at *2 (denying a motion for reconsideration when the movant repeated previous arguments based on the same evidence and law). So, even though the Rule 54 standard is "less exacting than that imposed by Rules 59 and 60," similar considerations drive the analysis. *Highland Cap. Mgmt., L.P.*, 2021 WL 7540296, at *1.

### B.   Motion to Amend

When the deadline to amend pleadings set by a scheduling order has expired, a movant must demonstrate "good cause" to extend that deadline. *S&W Enter., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003); *see* Fed. R. Civ. P. 16(b)(4) (providing that a party may only modify a scheduling order "for good cause and with the judge's consent"). The good-cause standard "requires the 'party seeking relief to show that the deadline[] [could not] reasonably be met despite [his] diligence.'" *S&W Enter.*, 315 F.3d at 535 (citing 6A Charles Alan Wright et al., Federal Practice and Procedure § 1522.1 (2d ed. 1990)). Whether a movant has shown "good cause" depends on four factors: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a

continuance to cure such prejudice." *Id.* at 536; *Filgueira v. U.S. Bank Nat. Ass'n*, 734 F.3d 420, 422 (5th Cir. 2013). A court should consider these factors holistically rather than "mechanically count[ing] the number of factors that favor each side." *EEOC v. Service Temps, Inc.*, No. 3:08-CV-1552-D, 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009).

If a court finds good cause to amend the scheduling order, it should allow the movant to amend his pleadings if "justice so requires." *S&W Enter.*, 315 F.3d at 535; *see* Fed. R. Civ. P. 15(a)(1) (specifying the standard for allowing amendments after the period to amend as a matter of course has passed). Apart from "any apparent or declared reason— such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the [R]ules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003). This Rule 15 standard for amending pleadings is easier to satisfy than the Rule 16 standard for amending a scheduling order. *See S&W Enter.*, 315 F.3d at 536; *see also Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981) (noting that the language of Rule 15(a) "evinces a bias in favor of granting leave to amend").

Even if the movant otherwise justifies an untimely amendment to his complaint, if a claim's statute of limitations has expired, a court should only permit the addition of a new defendant to that claim when the amendment "relates back to the date of the original pleading." *See* Fed. R. Civ. P. 15(c)(1)(C). Rule 15(c) provides that an amendment "relates back" if it meets three criteria. *Id.* First, the claim against the newly named defendant must have "aris[en] out of the conduct, transaction, or occurrence set out—or attempted to be set

out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B)-(C); *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 545 (2010). Second, "within the period provided by Rule 4(m) for serving the summons and complaint," the newly named defendant must have "received such notice of the action that it will not be prejudiced in defending on the merits." Fed. R. Civ. P. 15(c)(1)(C)(i); *Krupski*, 560 U.S. at 545. Lastly, the movant must show that, within the Rule 4(m) period for service, the newly named defendant "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii); *Krupski*, 560 U.S. at 545.

Rule 15(c) thus creates a mechanism for a plaintiff to add a new defendant after the statute of limitations has run "if the change is the result of a . . . misidentification." *Miller v. Mancuso*, 388 F. App'x 389, 391 (5th Cir. 2010) (quoting *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998)). And the plaintiff's awareness of the new defendant's existence at the time of his complaint does not foreclose the possibility of a misidentification. *Krupski*, 560 U.S. at 550. It could still be the case that he "misunderstood a crucial fact about [the defendant's] identity" that caused him to misdirect his suit. *Id.* By allowing relation back in these cases, Rule 15(c) "balance[s] the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Id.*

**4.    Analysis**

**A.    Dr. Thomas has failed to allege any clear error or manifest injustice that would necessitate reconsideration.**

Dr. Thomas first asks the Court to reconsider its previous order dismissing CHS from this lawsuit. Dkt. No. 86 at 1. The Court dismissed CHS because it determined that the only two claims against it—a RICO-conspiracy claim and an intentional-interference

claim—failed to state any plausible claim for relief under Rule 12(b)(6).  Dkt. No. 66 at 7–10, 13.  With respect to the RICO-conspiracy claim, the Court found that Dr. Thomas had not alleged actions taken by CHS that established any agreement between the defendants.  *Id.* at 7–9.  And as for the intentional-interference claim, the Court found that Dr. Thomas had not alleged facts showing that he would have entered a business relationship apart from the defendants' conduct.  *Id.* at 9–10.  Each claim thus died on its merits at the pleading stage.

If the Court grants reconsideration, it will effectively bring back CHS as a defendant to the RICO-conspiracy and intentional-interference claims.  But Dr. Thomas has not alleged any changes to the law or facts that necessitate a different outcome as to either claim.  *See* Dkt. Nos. 86; 96.  Nor has he argued that, apart from reconsideration, the Court will promote any "clear error" or "manifest injustice."  *See id.*; *Daniels*, 2004 WL 1810658, at *2.  In fact, Dr. Thomas has provided no reason at all for the Court to reconsider the dismissal of either claim against CHS.  Instead, he has misappropriated a motion for reconsideration in an attempt to add CHS as a defendant to his lone surviving RICO claim.  Dkt. No. 86 at 1–2.  But even if the Court grants reconsideration, it would not license Dr. Thomas to bring a new claim against CHS.  *See Williams v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 470 F. App'x 309, 313 (5th Cir. 2012) (noting that a motion for reconsideration is not the proper vehicle to bring new causes of action).  It would merely compel CHS to defend against previously resolved claims for no good reason.  Because such maneuvering would contravene the interests of justice, the Court denies reconsideration.

**B.     Dr. Thomas has demonstrated good cause to amend his complaint.**

Dr. Thomas alternatively asks the Court for leave to amend his complaint to add CHS as a defendant to his RICO claim.  Dkt. No. 86 at 9–10.  Whether he may do so first depends on whether he has shown good cause to extend the deadline for amending pleadings set forth in the Court's scheduling order.  *See S&W Enter.*, 315 F.3d at 536.  The scheduling order provided Dr. Thomas until December 1, 2020, to amend his complaint.  Dkt. No. 37 at 3.  Consistent with Rule 16(b), it also carved out an exception for amendments after the deadline "with the leave of the court, upon a showing of good cause."  *Id.*  Here, the Court finds that the balance of the good-cause factors weighs in favor of extending the deadline for Dr. Thomas to amend his complaint.

> **i.     Dr. Thomas has provided sufficient explanation for his failure to timely move for leave to amend.**

The first factor of the good-cause analysis turns on the movant's explanation for his failure to timely move for leave to amend.  *S&W Enter.*, 315 F.3d at 536.  Here, Dr. Thomas has provided a sufficient explanation.

Courts have found sufficient explanation for an untimely motion for leave to amend when the movant has recently learned of new facts through discovery that demand real-time strategic adjustments.  *Robles v. Archer W. Contractors, LLC*, No. 3:14-CV-1306-M, 2015 WL 4979020, at *3 (N.D. Tex. Aug. 19, 2015) (finding sufficient explanation for the plaintiff's late replacement of the defendant in his complaint "based on new information" he found in a contract during discovery); *Settlement Cap. Corp. v. Pagan*, 649 F. Supp. 2d 545, 566–67 (N.D. Tex. 2009) (finding sufficient explanation to add a new defendant after the pleadings deadline when discovery shed light on that defendant's role in the alleged conduct).  Courts have recognized that parties cannot "be expected to amend pleadings alleging new facts and

claims before learning of the new facts." *N. Am. Co. for Life & Health Ins. v. Sedlmair*, No. 4:19-CV-00802-O, 2020 WL 13490843, at *1 (N.D. Tex. Sept. 30, 2020).

In contrast, courts have denied untimely motions for leave to amend when "the movant knew of the facts underlying the new claim but delayed filing a motion." *Antero Resources Corp. v. C & R Downhole Drilling, Inc.,* No. 4:16-CV-00668-Y, 2019 WL 13193895, at *4 (N.D. Tex. Jan. 3, 2019) (citing *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 142 (5th Cir. 1993)).  And, even when a movant lacked awareness of certain facts, courts have held that the movant's own inadvertence or lack of diligence in uncovering those facts does not justify a delay in seeking an amendment.  *Taylor v. Trevino*, 569 F. Supp. 3d 414, 429 (N.D. Tex. 2021).  The movant must show that, despite his diligence, he could not have reasonably obtained the information needed to amend his complaint before the scheduling deadline.  *Id.* (citing *Am. Tourmaline Fields v. Int'l Paper Co.*, No. CIV.A.3:96-CV-3363-D, 1998 WL 874825, at *1 (N.D. Tex. Dec. 7, 1998)).

"Where courts decline to grant leave to amend due to a lack of diligence, it is usually because the party retained the records related to the desired amendment." *Howard v. Medicredit, Inc.*, 3:17-CV-3224-D, 2018 WL 3752366, at *3 (N.D. Tex. Aug. 8, 2018) (emphasis omitted); *see, e.g.*, *Lopez v. Reliable Clean-Up & Support Servs., LLC*, No. 3:16-CV-2595-D, 2018 WL 3609271, at *4 (N.D. Tex. July 27, 2018) (declining to find good cause when a party had possessed documents relevant to amendments for at least eighteen months before moving for leave); *Shofner v. Shoukfeh*, No. 5:15-CV-152-C, 2017 WL 3841641, at *2 (N.D. Tex. Apr. 7, 2017) (denying leave to amend where the plaintiff "had access to all . . . [relevant] medical records early in the case, yet waited more than a year after filing suit to first hire expert witnesses to review the records").

– 13 –

In his complaint, Dr. Thomas identifies CMC as "CHS's flagship hospital" where he held privileges and worked as a surgeon for many years. *See* Dkt. Nos. 1 ¶¶ 4, 9; 40 ¶¶ 4, 9. The hospital operated under the name "Covenant Medical Center" (Dkt. No. 92 at 5) and maintained registration of that name with the Texas Secretary of State through 2019 (Dkt. No. 96 at 5, 8, 10). So, naturally, when Dr. Thomas sought to sue the hospital for allegedly making a fraudulent report to the ACS in 2017, he named "CMC" as the defendant. *See* Dkt. Nos. 1 ¶¶ 37–41; 40 ¶¶ 42–46. CMC now contends that it could not have committed the conduct alleged in Dr. Thomas's complaint because it did not conduct material operations at the time. Dkt. No. 74 at 6–7. According to CMC, CHS owned and operated the hospital under the assumed name "Covenant Medical Center" at the time of the alleged conduct, but CMC itself had no connection to the hospital until acquiring it on January 1, 2019. *Id.*; Dkt. No. 92 at 5. CMC thus implies that Dr. Thomas should have brought his RICO claim against CHS instead. *See* Dkt. No. 92 at 5.

But Dr. Thomas could not have known the specifics of CHS and CMC's corporate structure and respective liabilities—or the impact of the 2019 merger on either—until CMC provided relevant discovery. Here, the relevant discovery was the merger agreement. *See* Dkt. No. 86 at 397–410. And it provides that CMC "shall automatically assume all liabilities and obligations of CHS under [] designated contracts and agreements" that "arise and accrue after" the effective date of the merger but "shall not assume or be obligated for any liabilities or obligations of CHS that arose or accrued under any . . . designated contracts or agreements prior to" that date. *Id.* at 409. It further notes that all "contracts, agreements, liabilities and obligations of CHS that are not expressly allocated to and vested in CMC . . . shall be unaffected and unimpaired by the [m]erger." *Id.* at 398. However

these provisions apply to the facts at hand—and the Court does not answer that question at this time—they establish the only basis for Dr. Thomas to understand how CHS and CMC had agreed to divide liability after the merger.  Without that understanding, he could not have known whether CHS is a necessary party.  Dr. Thomas's claim that CMC did not produce the merger agreement until July 19, 2021 (Dkt. Nos. 86 at 5; 96 at 4), thus suggests that he could not have amended his complaint before then.[4]

And this delay was not the result of his own lack of effort.  CMC had moved for a protective order to stay discovery in anticipation of moving for summary judgment.  Dkt. No. 68 at 5–6.  Dr. Thomas requested a variety of documents and other information, but CMC objected to each request.  Dkt. No. 73-1 at 6–10.  And because it refused to produce any of the requested documentation, Dr. Thomas moved to compel discovery.  Dkt. 73 at 2–3, 9.  On June 16, 2021, this Court ordered CMC to cooperate with discovery to the extent it bore on the threshold issue of whether it had "engaged in the alleged conduct and whether it may be held liable for it in this context."  Dkt. No. 78 at 4.  And then CMC began to comply.  *See* Dkt. No 82 at 5; Dkt. No 87 at 7.  Of course, the Court found that CMC was justified in withholding certain discovery before resolution of its motion for summary judgment.  Dkt. No. 78 at 3–4.  But CMC's reluctance to provide *any* discovery until ordered to by the Court prevented Dr. Thomas from obtaining materials critical to

---

[4] Notably, Dr. Thomas claims to have received the "Plan of Merger" on July 19, 2021 (Dkt. Nos. 86 at 5; 96 at 4), yet he did not file his motion for reconsideration until November 18, 2021 (*see* Dkt. No. 86).  But the Court stayed briefing related to CMC's motion for summary judgment pending resolution of Dr. Thomas's motion to compel.  Dkt. No. 79 at 2.  When the Court resolved the motion and lifted the stay on October 27, 2021 (*see* Dkt. No. 85 at 3), Dr. Thomas promptly moved for reconsideration (*see* Dkt. No. 86).

confirming the proper defendant for his RICO claim until far after the deadline to amend had passed.

CMC counters that a footnote[5] in its March 2020 motion to dismiss effectively notified Dr. Thomas of its belief that it did not assume liability related to his RICO claim when it acquired the Covenant Medical Center hospital from CHS.  Dkt. No. 92 at 5.  Whether the merger agreement supports this belief is unsettled.  Either way, Dr. Thomas had no obligation to take an unsubstantiated claim presented via footnote as reason to switch defendants and alter the course of his suit without conducting due diligence.  *See LCP RCP, LLC, v. Ally Bank*, No. 3:19-CV-00396-M, 2020 WL 12602659, at *2 (N.D. Tex. Sept. 14, 2020) (upholding a plaintiff's choice to wait until discovery of "facts necessary to plead [its] claim properly" to amend its complaint rather than amend earlier based on "speculation and conclusory allegations").  Despite CMC's early commentary regarding its lack of liability, Dr. Thomas possessed no documentation or other evidence to either confirm or refute its allegations until receiving the merger agreement.  And, by that time, the deadline set by the Court to amend pleadings had long passed.  Dr. Thomas therefore justifiably moves to amend his complaint at this juncture.  Given the sufficiency of his explanation, the first good-cause factor weighs in his favor.

### ii.   The proposed amendment is important.

The second good-cause factor surrounds the importance of the amendment to the broader litigation.  *S&W Enter.*, 315 F.3d at 536.  This factor, too, favors Dr. Thomas.

---

[5] The footnote reads, in part, "Prior to January 1, 2019, the hospital was directly owned by CHS and operated by it under the facility name 'Covenant Medical Center.' Effective January 1, 2019, the new CMC nonprofit corporation acquired the hospital from CHS. Defendant CMC did not assume any potential liabilities or obligations of CHS relating to any matter involving Dr. Thomas."  Dkt. No. 16 at 9.

Courts deem an amendment to be important when it directly impacts a party's prospect of recovery. *Feldman v. Stryker Corp.*, No. 3:18-CV-1416-S, 2020 WL 2507684, at *2 (N.D. Tex. May 15, 2020) (quoting *Kouzbari v. Health Acquisition Co.*, No. 3:18-CV-0126-D, 2018 WL 6514766, at *3 (N.D. Tex. Dec. 11, 2018)); *see also Maynard v. PayPal, Inc.*, No. 3:18-CV-0259-D, 2018 WL 5776268, at *4 (N.D. Tex. Nov. 2, 2018) (finding an amendment to be important when it added other claims by which the plaintiff could recover); *Davis v. Dallas Cnty., Tex.*, 541 F. Supp. 2d 844, 849 (N.D. Tex. 2008) (finding an amendment to be important where it would preclude the dismissal of claims).

Dr. Thomas's proposed amendment is paramount to his ultimate recovery. The Court has dismissed every claim but one: his RICO claim. *See* Dkt. Nos. 38 at 8–20; 66 at 7–10. If his RICO claim fails, so does his entire suit. CMC moves for summary judgment on the sole basis that because it did not operate the hospital in 2017, it cannot be liable for the report that founds the RICO claim. *See* Dkt. No. 74 at 6–8. CMC suggests that CHS, as the owner and operator of the hospital at the time, is the proper defendant. *See* Dkt. No. 92 at 5–6. If CMC is correct that Dr. Thomas simply sued the wrong defendant—and the Court makes no such determination at this time—his claim would not survive summary judgment because no genuine dispute of material fact would exist regarding CMC's liability (or lack thereof). *See* Fed. R. Civ. P 56(a). But, if given leave to amend to add CHS as a defendant, Dr. Thomas would receive an opportunity to resolve his RICO claim on the merits. His proposed amendment could thus make the difference between any recovery or none at all. This is exactly the type of amendment that the good-cause analysis promotes. For this reason, the second factor weighs in favor of good cause.

> ### iii.   Although allowing the amendment could prejudice CHS, the threatened prejudice is negligible, and a continuance could cure some of it.

The Court will consider the third and fourth factors of the analysis together.  The third factor asks whether allowing a late amendment will prejudice the nonmovant and, if so, the fourth asks whether a continuance would cure that prejudice.  *S&W Enter.*, 315 F.3d at 536.  In this case, allowing Dr. Thomas's amendment would minimally prejudice CHS, and a continuance could help cure the prejudice to a certain extent.

Courts have held that an untimely motion for leave to amend can prejudice the nonmovant "by prolonging the litigation, delaying the resolution of the case, and requiring that party to file new dispositive motions."  *Shaunfield v. Experian Info. Sols., Inc.*, No. 3:12-CV-4686-M (BH), 2013 WL 12354439, at *6 (N.D. Tex. Dec. 20, 2013) (citing *Lindsey v. Ocwen Loan Servicing, LLC*, No. 3:10-CV-967-L, 2011 WL 2550833, at *5 (N.D. Tex. June 27, 2011)).  Courts have also found prejudice when an amendment "drastically reframe[s] [a] suit" in the face of impending deadlines or an upcoming trial date.  *Guardian Techs., LLC v. Radio Shack Corp.*, No. 3:09-CV-00649-B, 2010 WL 11534474, at *3 (N.D. Tex. Aug. 13, 2010); *see also King v. Life Sch.*, No. 3:10-CV-0042-BH, 2011 WL 5242464, at *2 (N.D. Tex. Nov. 3, 2011) (finding prejudice when an amendment "essentially restart[ed] the lawsuit for amended pleadings, discovery, and motions").

This case differs from the typical case where a late amendment threatens prejudice to the defendant.  Generally, courts have found prejudice to a defendant when a plaintiff seeks to amend his complaint to avoid summary judgment.  *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F. Supp. 2d 802, 815 (N.D. Tex. 2009) (citing *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1151 (5th Cir. 1990)).  But, here, CMC—the last defendant remaining and the one

– 18 –

who has moved for summary judgment—would not be prejudiced by Dr. Thomas's proposed amendment. CMC may refile its motion verbatim, and whether CHS rejoins this suit will not affect the outcome of that motion or CMC's fate in the case generally. In contrast, CHS—whom the Court has already dismissed from the suit—faces potential prejudice in three ways. The Court will discuss each in turn.

First, rejoining CHS would prejudice its interest in the finality of the Court's prior order dismissing it from the case. *See* Dkt. No. 66 at 13. The threat of prejudice is especially clear where, as here, the affected party does not just expect to prevail at some point in the future, but already *has* prevailed and does not expect to return to the case. This Court has already dismissed two claims against CHS on their merits. Dkt. No. 66 at 7–10, 13. To then drag CHS back into this suit over a year later to defend against a different claim would undermine its interest in a final resolution.

This is not, however, a case of an unsuspecting party blindsided by a new claim against it. Dr. Thomas put CHS on notice of his RICO claim on February 25, 2020, when he served CHS with his complaint. *See* Dkt. No. 12. Even more telling is the fact that he brought that claim against CMC, whom he identified as "CHS's flagship hospital." Dkt. Nos. 1 ¶¶ 4; 40 ¶¶ 4. The face of his complaint shows that he intended to sue the Covenant Medical Center hospital for allegedly making a fraudulent report to the ACS in 2017, not the CMC corporation that did not engage in material operations until 2019. *See* Dkt. No. 40 ¶¶ 42–46. CHS recognized Dr. Thomas's mistake right away, as evidenced by its assertion in its motions to dismiss that CHS had only operated the hospital under the assumed name "Covenant Medical Center" at the time of the alleged RICO violation, while CMC the

corporation existed as an entirely separate entity.[6]  *See* Dkt. Nos. 16 at 9 n.1; 44 at 6 n.1.  So it should have also known that, had Dr. Thomas known that detail, he would have instead sued CHS as the owner and operator of the hospital in 2017.  *See id.*  CHS could have thus anticipated that Dr. Thomas would ultimately target it with his RICO claim, which offsets the prejudice to its interest in the finality of the Court's order of dismissal.

Second, reinstating CHS as a defendant could prejudice this Court's and the parties' common interest in the efficient resolution of this dispute.  If Dr. Thomas does not receive leave to amend his complaint, CMC could potentially end the entire suit if it resurrects and prevails on its motion for summary judgment.  In contrast, allowing the amendment would guarantee that the case lives on by permitting Dr. Thomas to press rewind and renew his RICO claim against a new defendant.  Such would demand new pleadings, motions, discovery, and, potentially, a trial on the merits.  The possibility of prolonging the proceedings by reframing the action thus threatens procedural prejudice.

Lastly, given the impending trial date, bringing in CHS at this late juncture could prejudice its ability to present a defense on the merits.  CMC has prepared for a potential trial on the RICO claim for more than two-and-a-half years.  *See* Dkt. No. 10.  CHS, on the other hand, has not prepared any defense as it was never included as a defendant to the RICO claim and has in fact been dismissed from the entire suit since April of 2021.  *See* Dkt. No. 66 at 13.  Should Dr. Thomas amend his complaint now to add CHS as a defendant, CHS cannot recover this lost time.  With less time comes less preparation, and, with that, the likelihood of putting on a second-rate defense at trial.

---

[6] Although Dr. Thomas had no obligation to rely on this assertion on its own as a basis to amend his pleadings (*see supra* Section 4(B)(i)), it does reflect CHS's awareness of his mistake in identifying CMC as the defendant for his RICO claim rather than CHS.

But the Court is careful not to overstate this likelihood in light of the corporate entwinement between CMC and CHS. CHS is the sole member of CMC. Dkt. No. 86 at 148. It formed CMC for the sole purpose of taking over its "hospital and patient-care assets and activities." *Id.* CMC assumed from CHS the existing operations, assets, contracts, rights, and policies of the Covenant Medical Care hospital. *Id.* at 149, 405–09. CHS has appointed its own board of directors to the board of CMC (*id.* at 144, 473) and required that certain of its executives provide services to CMC (*id.* at 147). Considering the interrelated operation of CHS and CMC under the same corporate umbrella, CHS surely has not been ignorant to the developments in this lawsuit. And because the RICO claim would still center on the alleged conduct of the hospital, bringing CHS into this action would likely require largely the same people, with the same resources, with the same attorneys, to make the same case that CMC would make should a renewed motion for summary judgment fail. The artificiality of the distinction between CMC and CHS thus counteracts the prejudice threatened by CHS's late entry into this action.

Turning to the fourth factor, continuing trial in this case would cure prejudice to some degree as well as exacerbate it. In one respect, it would postpone yet again a final outcome, further prejudicing the general procedural interest in efficiency. On the other hand, it would provide CHS more time to prepare for trial, which would help cure any prejudice caused by its last-minute inclusion in this action. *See Matamoros v. Cooper Clinic*, No. 3:14-CV-0442-D, 2015 WL 4713201, at *3 (N.D. Tex. Aug. 7, 2015) (finding that a "continuance of pretrial deadlines and the trial itself c[ould] ameliorate any [] prejudice" caused by adding new defendants after the deadline to amend).

– 21 –

In sum, granting leave to amend to bring CHS into this action could prejudice CHS's interests in finality of the Court's prior order, efficiency of the current proceedings, and preparedness for a potential trial; however, the unique facts of this case offset a great deal of this prejudice. The Court therefore finds that the third factor only slightly weighs against a finding of good cause. A continuance might cure the prejudice in one respect and worsen it in another; either way, given the general immateriality of the threatened prejudice, the Court finds that the fourth factor does not move the needle.

On balance, Dr. Thomas's satisfactory explanation for his untimely motion coupled with the importance of his proposed amendment outweighs the minimal threat of prejudice to CHS. The Court finds that Dr. Thomas has thus demonstrated good cause to extend the deadline set by this Court's scheduling order to amend his pleadings.

**C.      It is in the interests of justice to allow the amendment.**

Finding good cause to modify the scheduling order, this Court should freely grant leave to amend if "justice so requires." *See S&W Enter.*, 315 F.3d at 535. And because Dr. Thomas has already satisfied the stricter good-cause standard, the Court finds that justice requires an amendment to his complaint. He has shown no dilatory motive in failing to include CHS in his RICO claim until this point. To the contrary, he has demonstrated that, despite his efforts, he did not receive discovery needed to amend his complaint until recently. Nor is his proposed amendment futile; rather, it could save his entire lawsuit from summary judgment. This Court found that Dr. Thomas has pled a facially plausible RICO claim. Dkt. No. 38 at 11–14. A technicality concerning the proper defendant should not bar him from the opportunity to present his case on the merits. Justice thus requires that

this Court grant Dr. Thomas leave to amend his complaint to add CHS as a defendant to the RICO claim.

**D.      The amendment relates back to the date of the original pleading.**

One last hurdle stands in the way of allowing Dr. Thomas to amend his complaint. The Court previously found that the four-year statute of limitations for Dr. Thomas's RICO claim began running in 2017 when the ACS disciplined him.  Dkt. No. 38 at 7, 11.  Because the statute of limitations has now expired, the addition of CHS to his complaint must "relate back" to the date of his original pleading.  *Krupski*, 560 U.S. at 550.  Based on the three-part test set forth in Rule 15(c), the Court finds that it does.

First, the Court finds that Dr. Thomas's claim against CHS arises out of the same transaction as his original claim against CMC.  *See* Fed. R. Civ. P. 15(c)(1)(B)-(C); *Krupski*, 560 U.S. at 545.  Dr. Thomas does not seek to amend facts related to the conduct alleged in his original RICO claim—namely, the fraudulent report made to the ACS.  He merely seeks to add CHS as a defendant to the claim as the party who may properly retain liability for that conduct.  His amended RICO claim thus arises out of the same transaction.

Second, the Court finds that CHS received notice of the RICO action within the 90-day period prescribed by Rule 4(m) for service.  *See* Fed. R. Civ. P. 15(c)(1)(C)(i); *Krupski*, 560 U.S. at 545.  Dr. Thomas served CHS on February 25, 2020 (Dkt. No. 12), just over three weeks after filing his original complaint (*see* Dkt. No. 1).  Although his complaint did not initially name CHS as a defendant to his RICO claim, it set forth the underlying facts and the legal basis of that claim.  *See id.*  CHS therefore had actual knowledge of the RICO action within the period prescribed for service.  *See Sanders-Burns v. City Of Plano*, 594 F.3d 366, 378 (5th Cir. 2010) (finding that a defendant named in an original complaint had

"actual knowledge" of other claims not originally asserted against him).  Having received timely notice of Dr. Thomas's RICO action, CHS "will not be prejudiced in defending on the merits."  *See* Fed. R. Civ. P. 15(c)(1)(C)(i).

Lastly, the Court finds that CHS knew or should have known, upon being served with the complaint, that Dr. Thomas would have brought his RICO claim against it but for a mistake concerning the identity of the proper defendant.  *See* Fed. R. Civ. P. 15(c)(1)(C)(ii); *Krupski*, 560 U.S. at 545.  The face of Dr. Thomas's complaint made clear that he intended to bring his RICO claim against the Covenant Medical Center *hospital*.  *See* Dkt. Nos. 1 ¶ 4; 40 ¶ 4.  CHS knew that the hospital was unincorporated at the time of the alleged RICO violation, so it should have known that, apart from a mistake, Dr. Thomas would have sued CHS because it operated the hospital in 2017.  *See* Dkt. Nos. 16 at 9 n.1; 44 at 6 n.1.  Just because he recognized CHS's existence and brought other claims against it does not mean CHS should have assumed he made no mistake.  *See Krupski*, 560 U.S. at 549 (concluding that even a plaintiff who "is aware of the existence of two parties and chooses to sue the wrong one" could "harbor a misunderstanding about [the proper defendant's] status or role in the events giving rise to the claim at issue").  Here, his ignorance to the legal distinction between CMC the hospital and CMC the defendant at the time of the alleged conduct resulted in his misdirected action, and CHS should have known that.

The Court finds that Dr. Thomas has met each element necessary to establish that his proposed amendment relates back to his original complaint.  The preference of Rule 15 for "resolving disputes on their merits" thus favors allowing him to correct the apparent misidentification in his original complaint.  *See Krupski*, 560 U.S. at 550.  Having already

found good cause to grant leave to amend and that justice requires it, this Court thus grants Dr. Thomas leave to add CHS as a defendant to his RICO claim.

## 5.    Conclusion

In light of recently discovered information concerning the merger and division of liabilities between CHS and CMC, Dr. Thomas asks the Court to reconsider its prior order dismissing CHS from this suit or, alternatively, grant leave so that he may amend his RICO claim to add CHS as a defendant.  Dkt. No. 86.  Because Dr. Thomas does not contend that the Court erred in dismissing either the RICO-conspiracy or intentional-interference claims against CHS, the Court denies his motion to reconsider that order.  Dr. Thomas has, however, shown good cause for an amendment and that it would promote the interests of justice based on CMC's delayed production of the merger agreement, the amendment's importance to the life of his suit, and the negligibility of any threatened prejudice to CHS. He has also satisfied the elements necessary to establish relation back to his original pleadings.  Ultimately, the Federal Rules of Civil Procedure are meant to "serve as useful guides to help, not hinder, persons who have a legal right to bring their problems before the courts."  *Schiavone v. Fortune*, 477 U.S. 21, 27 (1986).  Dr. Thomas has alleged a facially plausible RICO claim, and here the Rules ensure that he is heard on that claim.  This Court therefore grants him leave to amend his complaint.

So ordered on September 19, 2022.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE